All right, for the appellant, and I'm going to let you pronounce your name if you don't almost certain to mess it up. Yes, go right ahead. Your Honor, my name is Mazen Sebade. I represent the appellants, Dr. David Masel, Dinesh Chandiramani, and I'm going to group the entities, call them the neuron shield entities, if that's okay. It's an honor to be here, and may it please the court. The issue that we've brought to this court, I believe, can be best simplified into a small story. The story is that Ms. Villarreal, through her business partner, came up to Dr. Masel in around May of 2014 and offered him the opportunity to build a business, and what expertise of the business and the ability to generate the revenue for the business. In her statements about her ability to generate the revenues of the business, which I think is the core allegations in this securities case, was that she, number one, had a trade secret method of billing for intraoperative monitoring services, IOM services. She had great connections in the industry and the billing industry. She had worked for Blue Cross Blue Shield. She had worked for UHC, United Healthcare, and she learned some secrets as to how to generate, quote unquote, the highest payouts, and then she quantified what those highest payouts were, saying it was $50,000 to $75,000 per procedure. Dr. Masel, who is a neurosurgeon, who has a lot of neurosurgeon friends that he envisioned could utilize the a little bit of his time, but mainly his credibility and his connections, and that's what he was bringing to the table, and he brought his business partner, Dinesh Chandramani, from Business Friends. He was bringing connections to the table, not merely monetary contributions, but he was bringing his broader connections, his Rolodex, his... I think that's fair to say, yes, your honor. He was able...well-known in the industry, and obviously he knows how to talk to neurosurgeons. I think that was really...but that was really it. He's otherwise operated as sort of a passive CEO when there were decisions, high-level decisions to make, mainly regarding distributions. He was brought in, but in terms of running the day-to-day operations of the company, that was all outsourced to Ms. Villareal. Is it fair to say he was expecting profits solely on the efforts of others? Your honor, I think the word solely is where I think the district court got tripped up, so I won't answer yes, because solely can be such a totalizing term, but if I would say overwhelmingly on the efforts of others, I think the answer would be yes. But he brought his own expertise and connections to the endeavor, which... I wouldn't say he brought his own expertise, your honor, and I don't mean to quibble semantically with you, because he didn't have any expertise in the actual IOM business. He doesn't know what the technicians do when they actually monitor the surgeries, and he doesn't do the function of what they call the professional component to actually review the schematics of the monitoring. He's a neurosurgeon. That's his expertise. I think the most we can say is that he brought some credibility to the business. He brought some veracity and gravitas to the business, certainly. You have a number of these entities, lots of them, a plethora of entities. Who are the mullets? Who are the other people in these entities? There are other investors in those entities. Who are the other investors? What do they look like? What are their qualifications? Some of the investors in the other entities are entities owned by other physicians who likewise can help bring business in, interoperative monitoring business in. If you look at the entities, they are geographically dispersed. They would have an anchor physician who could also help call their friends and bring business. Is it fair to say that the investors in this thing were basically other doctors like he was? Yes, your honor. I would say that's generally going to be true. I think there were some non-doctor investors, but by and large, they were doctor investors. Not to get too much into the corporate practice of medicine, there are some types of businesses doctors can own and some types of businesses doctors couldn't own based upon their affiliation with the business. If you look at the entities, some are LPs, some are LLCs. The LLCs were sort of the professional component. The LPs were the technical component. Those are generally the ones that had doctor investors. No, I'm going to say that again. I missed it. The LPs, the limited partnerships, were the ones that generally had doctor investors in them. And the other ones had? The LLCs occasionally had other investors in them. I don't have in front of me which ones did and didn't, but some of them were owned strictly by either Dr. Mazzel and Ms. Villarreal. And it's those LLCs that had the profits interest contracts that we discuss. And it's the LPs where Ms. Villarreal's entity actually was a limited partner of the company. And then she and the limited partner in her company, MPS, were hired on essentially and performed all of the day-to-day management functions from finding the business, from doing the billing, to doing the accounting, to scheduling the surgeries, literally making sure the C&Ms got paid, 100% of the day-to-day operations. This was recently confirmed by Ms. Villarreal in a deposition, and it was confirmed at the TRO hearing that we cite in our complaint. They did all of the back office and the day-to-day running of the business. Dr. Mazzel had virtually no, neither Dr. Mazzel nor Mr. Chandramani had any virtually no day-to-day operations. Those two gentlemen formed and managed and controlled the GP, the Neuron Shield GP. That's correct. But they outsourced, correct, the GP was an LLC, and that LLC outsourced the management side, the day-to-day. And I liken it to the difference between the chairman of the board versus the president of a corporation, to kind of bring it to something we're more familiar with in the securities world. Dr. Chandramani and Dr. Mazzel served on what we might otherwise think of as the board. Ms. Villarreal, she even calls herself the president in some of these documents. Mr. Cazares, I've never gotten his name pronunciation right, literally extolled himself as the COO, the chief operating officer of the businesses. So when you look at who's running it, the management team, Dr. Chandramani, Dr. Mazzel and Mr. Chandramani were not on that board. I think to quibble, the problem we have with the district court's opinion kind of be summarized into two, I think, overarching points. The first is the district court really didn't give us the benefit of the doubt like we're supposed to have, the benefit of reasonable inferences on any sort of ambiguous allegations, if there were any. And number two is we didn't have a chance to amend. We didn't have a chance to replete, to see if we could meet and plug the holes that the district court believed were there. I don't believe there were holes, but if there were, we should have gotten an opportunity, I believe. If I noted, I actually went through this again last night. You know that Judge Mazzott is a really good judge on this kind of complex business case. This is really one of his strong points is understanding this kind of business relationship. I'm going to agree with you in then some. I think he's a fantastic judge. We're in front of him all the time, and I'm not saying that because I don't think he's going to listen to this, but I just think he happened to get it wrong here, Your Honor. I agree. I think he's also a very overtaxed, has a very overtaxed court because of being in the eastern district of Texas, and so I don't lie blame at his feet. I just think he got it wrong here, but I think we should have had a chance at the very least to amend and try to plug the holes that he identified. The first and primary thing that he says is, the first and primary problem, I think, is that he took the sentences that we alleged from that first same conversation where she says, I can achieve the highest payouts, and I do achieve the highest payouts in the industry because, essentially, she has the secret sauce, which that secret sauce has been upgraded in 2017 in a TRO hearing in front of a state court judge in Dallas. It's been upgraded to an algorithm that can actually pinpoint within 10% the payouts, and that those payouts, she believes, because of her secret sauce or other aspects of her secret sauce, documents and methodologies and whatnot, actually helps her achieve those payouts. Same discussion. And that the payouts happen in six months. That's all one conversation. The court split those up into separate sentences and dealt with them in isolation. However, even dealing with those in isolation, the first one he took on was that, you know, that her secret sauce achieves the highest payouts in the industry. And they said that that was mere puffering. That was discounted as mere puffering. I would say it isn't mere puffering, one, because it was actually quantified right afterwards. Same conversation. $50,000 to $75,000 per procedure. Secondly, Virginia bank shares, Supreme Court case in Virginia bank shares, took nearly identical language in the context of a direct sale to a shareholder. I think that's what distinguishes our case and Virginia bank shares from many of the other cases cited by the appellees, which is that the fact that this is a commercial context where, you know, that type of, even if it's hyperbole, is understood or expected to be understood by the listener as having some factual substantiation. It's not mere puffery under Virginia bank shares. And I noted the appellees have cited not a single case to contradict Virginia bank shares or to show how that language in this context could be taken as anything other than a statement of fact about the existing metrics, the existing ability, in other words, something, a statement of historical fact at that time because of what she had already been doing, especially when it's followed right away with a quantification of what that really means. So focus in on while you have time on why this is an investment contract and therefore a security. Thank you, Your Honor. I will do that. I think there's several reasons. The first is, obviously, the contracts themselves say it's a security. Now, I know that that's not outcome-determinative, but the case law says that at least gives you a presumption. That means the parties intended for it to be a security, and both of the contracts at issue say this falls under the 33 Act. Now, this lawsuit is a 10b-5, which obviously falls under the 34 Act, but it's pretty well established that what 10b-5 applies to is a broader set of securities than those requiring registration under the 33 Act. So I think that's sort of your first piece of evidence, and that should have been enough, frankly, I think, to get us past the 12b-6 at this point. Secondarily, though, we have the SEC regulations, which discuss what a promoter is. This was a woman who came in and said, you create these businesses, you're going to give me a security, you're going to take a security. LP interests are securities, LLC interests can be securities, when they're derived, and I know sometimes the Howery test is solely from the efforts of others, but it's actually been revised to overwhelmingly or predominantly on the efforts of others to allow for this promoter aspect, that you have some, there's a little bit of something being done by the promoter or by the person raising the money or raising the or selling the securities. Next, Your Honor, I would go to the fact that LP interests in Texas are presumptively considered securities. They are passive investments by statute. That was never addressed in the court below. It was never addressed in the appellants brief. And I noticed that I would also note, Your Honor, that the court below didn't rule on this issue. Normally when courts are going to find that something isn't a security, that's an a priori question that they address before they get to the nuts and bolts and meat of whether or not there was a fraudulent statement made. Judge Mazzant skipped over that in this case, which suggested, at least to us, that he thought it probably was a security based upon these arguments. So we're in harmless error land talking about the security, and I noticed, I noted that the appellees in their briefing on this point actually didn't raise a single argument about facts, a single case dealing with the facts as they exist here. They discuss, you know, random investment contracts and people who actively work in their business. We don't really have that here. Williamson v. Tucker was the court of appeals, the Fifth Circuit case in 1980, that said it could be from the efforts of a promoter and primarily from others. I was trying to remember the name of the case, and I found it in my notes. The last thing I would say on that is that the LLC interest, specifically, which is a profits interest, is a typical investment contract. It is the everything about a security without the control, and that was done as a technical workaround for the corporate practice of medicine by some corporate lawyers somewhere in Dallas. But the fact that it says it is a security, that the interest related to that is untied to a parallel state case that they are suing on, on these securities, saying that they are entitled as securities holders to the fiduciary obligations of Dr. Mazzell and Mr. Chandramani suggests to me that they believe these are securities because their state court case took that position. I don't know if I fully answered your question, Your Honor. Did you have a more? You're about to run out of time, sir. I'm about to, yes. Why did it have to be a security? I mean, what this woman says, basically, is that, you know, I can turn dross into gold or words to that effect. I mean, I can take your receivables and get a better payout on them than you can if you just go along the way you're doing it. That, in its essence, doesn't require the creation of an LLP or a security interest or any of that. So why, I mean, that's the problem here is that what she was essentially offering to do wouldn't have required creating all these entities. And so why, I mean, how do you tie that into the security part of it? Can I answer that question? Yeah, please. I agree with everything you're saying. And the difference is, and what you're describing is why isn't this normally a commercial, a commercial contract? Right, exactly. The difference is, is she wanted to be an owner. That's the difference. Normally, when someone says, hey, hire me as your biller because I have a secret sauce that's going to generate the highest payouts, I agree with you. If all I had was a billing contract with her, we wouldn't be here on a securities case. But she wasn't satisfied with just a billing contract. She asked to be an owner. And not only asked to be an owner 5, 10 percent, won 35 percent of the business in both sides, on the LLC side and on the LP side. She asked to be an owner. I think that's the distinction that I would make, Your Honor. She asked to be a part of the business. Normally, billers don't do that. And normally in a commercial context, someone says, I can perform this service for you. They don't also go, and I want a piece of the company for it. Well, and the other thing that tends to support the suggestion that it's a security is that you got all these other investors in effect. The doctors. Absolutely, Your Honor. We all, I mean, doctors are the quintessential mullets. They are. I mean, you know, what they want to do is turn dross into gold. I mean, get more money for their receivables. It's not dross, actually. They're receivables. But they also want a piece of the action. And there are rules about how they do it, and that explains the sort of complex web of entities. But I completely agree with Your Honor. I mean, I think the fact that there were passive interests all over the place is why it is a security. All right. Thank you, Mr. Cervantes. You've saved time for rebuttal. Mr. Hathaway. Pardon me. Good morning, and may it please the Court. I'm here on behalf of Richard Hathaway. I'm here on behalf of the appellees, Adriana Villarreal, Anthony Cesares, NPS, CGR, and IOS. And, Your Honors, we believe that Judge Mazant got this perfectly correct. But I'm going to address these issues in the order in which the questions came, and I'm going to focus initially on the security before I focus in on what Judge Mazant focused in on, which is the actual language, both individually and in connection with determining whether or not there is scienter, the totality of the statements in connection with the complaint that was raised. A couple of things out of the gate with regard to the security, and I'd like to direct this Court to page 14 of the plaintiff's, pardon me, the appellant's brief. It's page 14 of their brief that I think encapsulates a lot of what Judge Willett was asking about, and that is this. It says, Dr. Mazzel's established relationships with neurosurgeons and referral sources in the neurosurgical industry were critical to NeuronShield's growth. Dr. Mazzel's relationship with neurosurgeons gave him an edge over other providers when competing to offer IOM services to these doctors. Dr. Mazzel's relationships paid off. In two and a half years since it was established, NeuronShield provided over $190 million in IOM services to patients undergoing surgical procedures according to NPS's records. His efforts paid off. This is not... Well, that's sort of like Mr. Sebade's analogy to people who serve on the board of directors of a major company. These may be well-known, prominent people for one reason or another who serve on the board, not because they have any expertise in running a company, but because he called it gravitas or credibility. They lend something to the company's relationship with the rest of the world by being on the board, but not by knowing how to manufacture a widget, necessarily. Well, Your Honor, Your Honor makes a good point, but the involvement that is pled in the complaint, and as conceded in the briefing, is more than just somebody who's passively on the board. I mean, the language that they articulate in the complaint is very simple, that he was involved in such a manner that it was critical. That's their language that they pled, and it was result-oriented. It was because of his conduct, his connections, and his bringing the other doctors in, these connections, because he also pleads that he was to Dr. Silva, and that's an example that he pleads in which he is introducing and he's involved in the creation and management. He also, they also plead that they created. Dr. Silva didn't stay in, though, right? That is correct. It's just an example where he's, where they've pled where he's introducing. He's a cardiovascular surgeon. Pardon me? He's not a neurosurgeon. He's a cardiovascular surgeon. Your Honor's correct. Yes. And so it's, those examples, pardon me, that conduct shows, and Dr., pardon me, Dinesh Chandramanari also was involved in the operations of it. That's something that they, they pled specifically in their complaint. He's not, he's involved in operations. That's how he was supposed to be compensated. Another misstatement, I believe, that was made was the assertion that Villareal is somehow a limited partner or a member. She is not. Okay? She is an individual, and she is a, she made representations, and there are allegations against her in connection with her representations. There are also assertions that, that Mr. Cesare has made representations. He made the assertion of one representation and an adoption of other representations by Mrs. Villareal, and then there's also allegations that he made two omissions. So those are specific to them. But the entities that are the limited partners that were involved were either NPS was not a limited partner, was not a member. It was solely a billing company. And all of the representations at issue concerned NPS. So when examining the securities issue, you look to the, the language that even this Court, this Court had exam, had utilized, pardon me, as in the AFCO Investments 2001 LLC v. Prosker Rose LLP, the came to a different conclusion than the facts would support here. And they came to the conclusion that in that instance, they were passive investment, and that just because they had a title, that was not sufficient. But here, we've got bald allegations, uncontested allegations, statements from not just their brief, but their complaint itself, showing that his involvement, Dr. Mazzell's involvement, was critical, and that Mr. Chandramanaray was, in fact, directly involved in the actual management. The other issue I wanted to address was this issue of presumptive securities. There is not a case in Texas, pardon me, in this, in this district, that indicates that these are, that an LLC is, in fact, presumptively a security. Even this Court in AFCO Investments 2001 LLC, when it does this opinion, it actually goes through the analysis. It doesn't say, these are LLCs, that was an LLC case. Therefore, because it's an LLC, it's automatically, presumptively, in this, going to be a security. It doesn't say that at all. Otherwise, why would you have the Howey test in connection with whether or not it's an investment contract? Clearly, that's, it just doesn't make any sense in that context. Additionally, Your Honor, I don't, I believe that while these documents reference the Act, in connection with the argument that these things concede or argue that they're part of the Act, I think they reference the Act. I do not think that in any way they adopt or, or indicate that they are part of the Act. But what those limited, what those limited partnerships are. Sotomayor, which Act are you talking about? I'm talking about the Securities Act. Okay. If I remember correctly, I believe they reference them, but I don't believe they indicate that they're a part of them. In fact, and I know that that wasn't part of any of the briefing argument. There is an assertion that somehow these securities interpretations or the Texas Business Organization Code somehow would apply, but the Fifth Circuit, this Court's anyway adopted that or applied that in connection with the Howey test. It's very specific to whether or not they're solely an expectation that the money's going to come from, the profit's going to come from a third party. And that's not what's happening here, period. And Judge, Judge Mazant did not address this. He did indicate that there were five, five arguments raised in this context, and only one of them that he needed to address, and, and that's what he did. He addressed the ones that, that obviously on its face appeared to be sufficient to dismiss this complaint. And we believe that the purpose behind, behind the PSLRA is why the Court rightfully dismissed this complaint, and that is to avoid this lawyer-driven litigation. One other issue before I go to that was there was an assertion that somehow in the State case that we're alleging or arguing that these are somehow securities. That's also, one, not in the complaint, but it's also not true. It's not accurate. We're alleging a breach of contract and breach of fiduciary duty. The word, we're not alleging any sort of Texas Securities Act claim or, or any, any Federal claim at all. So I, I wanted to address that issue to the extent that it may have confused or in any way misled the Court. But the purpose behind, behind this is to protect businesses from frivolous lawyer-driven litigation. That's the Texas, that's the U.S. Supreme Court that points that out. And I think that when we look at these particular statements, okay, the first statement in itself that they address is this, that Judge Mazant finds is puffery, is this, this statement that in 2014, in May of 2014, that they alleged that she purportedly said that the NPS was, quote, superior at billing IOM procedures and, quote, could generate the highest payouts. Now, Judge Mazant relied on, on proper authority, clearly in this region, in this area. They've tried to sidestep this and make it about, about a very different type of case. But this Court has recently, as recently as October 3rd of 2018, in which there were three tranches of the types of representations. The second tranche, though, is a lot like and uses a lot of a similar language that is at issue here. First is, is that Whole Foods statements to investors that it had, quote, the highest standards in supermarket industry, highest standards, okay, and that it was different and better than most of its competitors. These are vague statements for which an investor wouldn't rely on. What about the statements about, what, $50,000 per procedure or that sort of thing? Those are not vague or indefinite. Your Honor, those are, those are not puffery. We're only, we were addressing this initial statement and I believe he blended and started talking about the other statements. There are other statements that are, that are alleged in connection with, there's a 2014 and then there's, there's later an email that they talk about as well, that there's some communication. That, that email, I think, wasn't even an email to him, but, but no, you're, you're correct. Those are not the same thing. They were, this is a, the first statement Judge Mazzant rightfully holds is puffery. This is just a, a general statement. It's corporate cheerleading. And that's exactly what this Court has very recently determined and had authority to, pardon me, and recently provides authority that would support this position. Anthony Cesare, as an, as an assertion, the one statement that he made is also, we can't, in September of 2014, he represents to Mazzel that IOM business was extremely profitable and that Dr. Mazzel could earn a substantial return on his time and money if he were to invest in an IOM company. That's the statement that they assert that he said. That, again, is exactly the kind of puffery. It's not a specific statement. It's talking about a possible, to earn a substantial return, very vague, and that this general business was extremely profitable. Again, very vague. Also, the Court determined that that was puffery. We believe that Judge Mazzant had it right. He nailed it down. That's absolutely correct. We're going to rely on this Virginia Bank shares, which he talked about. That's a P. That's before the PSLRA, first. Second, it's also talking about Section 14a security code. It's not, it's not a, it's not like our case here, not at all. Also, in that instance, there was, there was a discussion between board members, and there was some indication or evidence that when they made these representations, these general representations, that they knew that the basis of those representations was, in fact, not true. And that was why those particular statements, that and the fact that these are board members that are making these fairly general statements, but they also give you reasons and rationales behind them, that differentiates it here. Remember, we got strangers meeting in 2014 at a, I believe it's a, it's a Corner Bakery. Very, very different sort of circumstances here than a board member, a board member is talking about general statements and then additional, additional discussion about the basis for them. Very, very different context here. Virginia Bank shares, Your Honor, pardon me, Your Honors, does not at all apply. We did differentiate it in our response. And it's curious that this Court, as recently as October 3rd, 2018, also didn't address this Virginia Bank shares opinion. It's because it clearly wouldn't have applied. It's not, it doesn't apply at all. It doesn't fit within this genre of litigation. It sits out by itself, pardon me, in that regard. The additional statements that were made, there were actually, I wanted to address Statements 6 and 7 very briefly. And there's, these are where Judge Mazant found that there were two statements where the, where the lack of particularity was met, the where requirement. There was a February 2017, pardon me, February 27th of 2015 alleged statement from Villareal to Dr. Mazzell. There's also a November 26th, 2014 statement where there's an assertion that Villareal quote bragged that NPS's average out-of-network claim will reimburse around, and this is that statement you asked about, around 50 to 75K. Around. It's a qualifier. But what Judge Mazant looked at in focus time was look, this, there's no, there's nothing that indicates where this was said. It doesn't meet that initial requirement. So again, to Your Honor's question with regard to this 50,000 of these statements, these blending of these facts, Judge Mazant got it right. Are you talking about the specificity of Rule 9, or what are you talking about? In this instance, it is 9B and the PSLRA.  It doesn't, it didn't meet the where requirement. And we believe the judge got that correctly. Plaintiffs actually admit, and if you look to, on the brief on page 32, plaintiffs admit, they say the complaint did not specifically state that these statements were made in e-mails from Villareal. Then they asked to amend. Now, let me address that amendment issue. This Court has time and again had this type of situation happen. But here's a difference between those previous situations and this one. There was no request in the response to the motion to dismiss for amendment. Nowhere. They didn't make that request. After the Court made its ruling, there was no post-judgment request for amendment. There was nothing submitted that indicated this would be how they would fix it. There's nothing to, there's nothing attached to indicate or file, or given the district court, given Judge Mazant a chance to even consider this issue about whether or not they should get to amend. According to Fifth Circuit authority, that means that they waived it. They don't get to come here and argue for the first time and, and, and try to say Judge Mazant somehow got it wrong, when Judge Mazant never had the opportunity to hear it or address it. They waived it. And there was a case directly that we cited that was, that, pardon me, that, that directly addressed and discussed the issue. Let's see, it was the Ransom v. National City Mortgage Company. It's an unpublished opinion. 595F Appendix 304, Jump Page 306, and it's 2014, en banc, unpublished. It cites the Greenberg v. Crossroads talking about arguments not raised in the district court, cannot be asserted for the first time on appeal. Also, this Court addressed this abusive discretion standard in the Rosenwig v. Azarick's Court. It walks through the process of how the court, how the district court is supposed to do this. The district court never had the opportunity to do this, to address this issue of whether or not this should be, they should get a second, or pardon me, a third bite at the apple. The record did show, however, that there was an extensive set of briefing about whether or not the first amended complaint was proper in the first place. And Judge Mazant did give them that opportunity to amend. And in their response, they indicated that the only purpose that they needed to amend because they felt like they were so confident with their initial pleading was to address certain issues with regard to a party that's not even on appeal here now, which is U.S. Mon, which is a contracting entity that actually held the database that NPS used and NPS contracted with in order to hold some of NeuronShield's data, but also data belonging to NeuronShield's other clients and customers. So that's, and that's in our briefing, points to exactly where they pointed out in the record where they say that's the reason. So there's an additional ground to the extent the court wants to do the analysis of futility. Additionally, beyond the fact that they waived it, it's futile. They've already indicated that was their best shot. Now they want to come back and say, oh, well, this, you know, we need to fix these things for the third time, pardon me. The big issues, we believe, though, and I have three minutes left, is this. This is simply a fraud by hindsight case. Time and time again, they basically say that Ms. Villarreal promised X. They've more or less framed these all as promises. They say if she was going to get us this, even though it says could or possibly, you know, she's talking about what could possibly happen in the future. Because these ultimately don't happen, though, after two and a half years, it's fraud. That's fraud by hindsight. There's no discussion whatsoever, no pleadings for these statements that show that why each statement as it was made was in fact untrue when it was made or that they knew that it was not true when it was made. And Judge Mazant very handily disposed of all of the admissions because they never at one point even addressed the scienter argument whatsoever with regard to any of the three admissions that are at issue. But in looking at the totality, he examined those surviving, pardon me, those surviving portions of these statements that he didn't knock out because they failed to meet particularity. And I think those are statements, I want to say it's two through, it is, I think it's two through four. Yes, it is. It's two, three, four. Those statements did not survive, did not have, pardon me, did not provide any sort of specific facts to indicate that the particularity requirements for scienter were met. And we briefed and actually analyzed all of the statements to ensure that the court, when you examine this issue, they never met any of the particularity requirements with regard to scienter on any of the statements, period. The best that they do is they use the general statement. They say defendants must have known or defendants had a motive to take the business. Now, I ask you, does it make sense when a billing company, and they want to have some sort of positive inference. Well, here's the counter inference in connection with scienter. It's really simple. Would a billing company getting 8%, why would it cancel its contract if its motive was to steal the company, as it's been alleged? Why would a limited partner, a CGR or IOS, why would they, with 35% return, why would they terminate their agreements if they were trying to steal the business as it's been motivated? This Court has held numerous times that that type of profit motive, one, is not sufficient by itself, and they do not plead sufficient facts to indicate why, how, or what the process was that was going to actually enunciate any of this scienter requirement. They don't do it. They never do it. This is 40, 400 paragraphs of just repetitive things again and again trying to substantiate 13 claims. Your Honor, appellate's asked that this Court affirm Judge Mazzant's ruling. We believe he correctly ruled. Thank you. Thank you, Mr. Hathaway. Mr. Sebade, you've saved time for rebuttal. I'd like to start with framing the PSLRA and the Virginia bank shares case. The PSLRA was enacted because there were too many class actions, stock drop class actions being filed in the 90s routinely. Every time the market changed, a bunch of publicly traded companies were getting sued by people saying, well, I lost money in the public market and therefore I need to be able to sue. That's what the PSLRA was trying to rectify, was to be able to differentiate at the pleading stage between people that lost money due to the natural vacillations of a stock market versus some actual fraud happening in a public company. That's not this case. Even though the PSLRA applies here, those strictures don't exist here. The issues don't exist here. We don't have a company where someone is being sued just because they signed the 10-K, which leads me over to the Virginia bank shares. I don't think he framed the opinion correctly. He framed the opinion as a discussion amongst board members. If you look at the actual holding, the holding was that when somebody says you should buy the shares because it's going to be highly profitable, it's going to be a great return, and that is communicated to shareholders to approve a merger, then the court said that is sufficient under the securities laws, and it's not mere puffery because it was being directly stated to shareholders for them to be able to take an action, to buy the securities of the new company essentially. It was a stock-for-stock exchange. That's why it's applicable, is because it was in the context where it was being directed at shareholders, as opposed to the other examples that he gave and the examples I mentioned in my opening where someone is simply at Whole Foods, for example, and say, you know, we're the best in the business. That's mere puffery because, number one, it's not even a statement directed at shareholders. It's a general statement about the company in the market. Moving towards, I'm going to go where he ended, which is that this is somehow fraud by hindsight. I'd like to address that if I could. If you look at the timing, the conversation happened in May. She quantified the highest payouts in an oral conversation in May. She never achieved those. Out of 1,300 cases and procedures that they did, less than 6% of those paid anywhere near the amounts that she had. Over 50% of them barely paid, most of them paid zero and barely paid over $0. So this isn't a situation where we have a radical change in the market where at one point she was getting $50,000, but something changed and now she just couldn't, so it's a promise unfulfilled, but not her fault. We don't have any of those circumstances here. She reiterates it in an email six months later. Dr. Mazzel, because they're not getting the $50,000 payouts and instead they have this growing AR, asks two questions. What did you say the payouts were? $50,000 to $75,000. How much of the $110 million AR do you think we're going to collect? She goes, I usually say 50%, but oftentimes it's more. That's what she reiterates. She reiterates her fraudulent statements in writing when he's looking for assurances saying, didn't you say we were going to get $50,000? That's the proper context of those conversations. So the fact that that also leads us to why there's Sienta, why I believe there's a strong inference of Sienta. Number one, she personally made those representations multiple times. Number two, this is a small business. It's her secret sauce. It's her algorithm that she says she developed. She's talking about its ability, her ability via this algorithm to generate profits. This is all information that's within her control. It's not like the Bernie Ebers case, the MCI World Comp case that they cite where Bernie Ebers simply signed the 10K and they said, well, you should have known that your accounting violated GAAP because you didn't write down your AR, your aging ARs. Completely different. There was no reason for him to know. He wasn't making a statement. In this case, she should know. She's saying it's her ability. Her brainchild of a secret sauce. She had personal knowledge, and she immediately failed to live up to it. The case law says that when you have such a temporal failure between a representation of fact and the failure of that fact, without any explanation, without any intervening cause, that should be enough for an inference. Quick item. You said earlier that the district court, Judge Mazant, denied our chance to amend and plug holes. Yes. Mr. Hathaway says you never raised it. You never requested the chance to amend below, and thus you waived it, and you say? I don't believe we waived it. I agree with him. We didn't file a post-judgment motion. At the end of our closing brief, we asked for other such relief as the court may allow us, sort of intimating, hey, you know, we thought we were going to have a hearing as well where we could understand whether we needed to be able to do that. But that notwithstanding, we did ask to make a general request for any other relief in addition to denying their motion. The only other relief that could have meant was a chance to amend or a chance to present an argument for amendment. If I could have five seconds to close with a ---- Your time has expired, Mr. Sebade. Thank you, Your Honors. Thank you for your submission. We will now take a brief recess.